Good morning, ladies and gentlemen. We're pleased to be with you this morning. Welcome to the Ninth Circuit. We have three matters on the calendar that were ordered, submitted on the briefs. That was Lopez-Lopez v. Barr, Bleemaster v. Sabo, Manning v. United States Department of Defense. We have three matters to be argued, which we will take in the order in which they appear on the calendar, beginning with Angeles v. US Airways. Counsel, when you're ready. Good morning, Your Honors. Arlo Riazze, attorney for plaintiffs. We'd like to reserve five minutes of our time for rebuttal. Okay. The primary issue that the Court must first decide is with regards to competing overtime exemptions. We have an overtime exemption that resides in the IWC. We call it the RLA exemption. To get the RLA exemption, you need a CBA pursuant to the Railway Labor Act. We also have another exemption that resides in the Labor Code, and that exemption is found in Labor Code 514. Labor Code 514 was enacted as part of AB 60 in 1999, after the RLA exemption, of course, and interpreted thus far. Let's stand this RLA exemption would actually weaken the Labor Code exemption. In order to get the RLA exemption, you only need a CBA. No requirements, none whatsoever. With regards to the Labor Code exemption —  Well, Your Honor — I mean, if the parties have agreed, based on negotiations between the employer and the union, to certain provisions, what's wrong with that? Well, what's wrong with that is that the IWC exemption cannot weaken, cannot undermine the Labor Code. Oh, it can if the Labor Code says it can. Correct. Well, so why doesn't the Labor Code say it can? California has had this parallel system for a long time. Correct, Your Honor, correct. And Labor Code 514 actually says it can, right? Yeah. But it puts this requirement. It says, sure, you can, but just make sure that the CBA has premium wage rates for overtime work. That's what it says. And that's exactly the momentum in 1999, right? The momentum — And the CBA actually does have premium wage rates for overtime work. It simply doesn't cover overtime that's taken on voluntarily through an employee trade. Correct, correct. And that's the gist of the liability. We know what your argument is, but you haven't explained to me the logic of your position, which is why isn't the Railway Labor Act exemption a logical provision for California to enact? Because the CBA in question here — it is in some CBAs, right? But the problem is the CBA in question here. The CBA in question here actually defines the overtime, which is fine to do, right? It doesn't have to follow 510. It defines overtime in its own way, and that's fine. It says overtime is 8 and 40. It says it very clearly. Daily overtime qualifier is 8. It says it very clearly. Weekly overtime qualifier is 40. And it says employees are entitled to trade. And work that through. The position you're advocating would cause the company to say, well, heck, we're not going to let employees swap shifts and trade off because we're suddenly going to pay overtime that we wouldn't have to pay. So the end effect of what you're advocating is encouraging the company to take away this benefit for which the union has negotiated. The CBA actually has that, Your Honor. The CBA actually says that. If we have to pay premium wage rates for this shift trade over 40, we're not going to allow it. And that's fine. That's exactly what overtime is. So you're willing, through this lawsuit, to take away a benefit the employees' union has negotiated for itself. And exactly what's logical about that? It's not a benefit if you conceive of overtime as if a day's work is 8 hours. It's a benefit because employees don't have to do it. They voluntarily choose to do it and put them in the position, knowing that the company doesn't plan to pay them at overtime rates for what they have voluntarily decided to take on. Well, there are other provisions in the CBA. And there are situations where the company asks them to do the work, right? And that's different. But that's not this case. This case is about employees trading for themselves. And I'm trying to figure out how exactly does it benefit the employees, your clients, to take away a benefit that the union has negotiated for them that allows them to swap off. Because the reality is the company then has to adjust. And the company would have to assign those hours to employees. And the overtime still needs to get worked. No, no, no, no. Because once the shifts have been determined by seniority, something else the union has negotiated for, the company doesn't have to do anything to make those trades. It doesn't have to put itself in a position of paying overtime that it wouldn't have to pay. It will simply say, no trades. End of story. And the CBA anticipates. And that doesn't complicate the employer's life at all. It takes away a benefit from the employees. It depends on what you conceive as a benefit, right? You're forcing people to work. The ability to trade. You're not forcing because you don't have to trade. It's the employees who choose to trade knowing they're not going to be paid at a higher rate for that time. Everybody understands how it works and what you're doing with this lawsuit is trying to upset that apple cart and take away the ability of the employees to make that trade. That's not true, Your Honor. Why isn't it true? Why is that true? Because you have to see what the California legislature did. No. No, no, no, no, no, no. I'm not talking about the statute. Sure, the California legislature could itself say no trades. I'm saying I don't understand how your position benefits the people you purport to represent because it takes away the ability to trade that the union has negotiated for. And explain to me how the employees aren't disadvantaged by what you ask for. We're assuming that result, Your Honor, right? There's nothing in the record that says that that is the result, right? We're assuming that result. What do you mean is the result? We're assuming that the result is that the workers will not be able to work overtime if they need it. Well, you just told me that's obviously what the company would be able to do. The company can do that, but the realities of the workday may force the same way that your result can happen, it could also force the company to schedule these shifts better, to make them full-time workers, right? And what we need to manifest, there's many different results that can happen. I don't want to go down that road, but I've got to tell you, I don't understand at all the logic of what you just said, how the company will suddenly decide if they can't let employees make changes, it's going to wind up turning these people into full-time employees and so forth? Because the shift still needs to get work. The people that let go of these shifts are usually like senior employees that did not want to work in the first place. So it's not like if you change the system that they're suddenly going to work. These shifts still need to get covered. So there are – So is this suit really about sort of junior employees against senior employees? Is that what you're pitting against here? No, no. I mean, it certainly seems like it because, as Judge Clifton has pointed out, this was negotiated by their union representatives. This is not something that was demanded by the company. This is something that was negotiated. This is what apparently the employees wanted. And your argument suggests that, well, maybe it was wanted by the senior employees, but it wouldn't have been wanted by newer employees. Right. And the result, too, is that they're hiring more part-time workers, right? But regardless of that, Judge Beebe, the thing that we need to protect is the AB60 when it says that the workday and the overtime needs to get manifested. If, in fact, you define it as overtime, as the CBA does, you can't say, okay, it's overtime, but we won't pay it. It's overtime, but we won't pay the premium wage. It's a flexible work schedule. It allows employees to trade shifts. And I'll trade with you this week. Maybe you'll trade with me next week. And that works for both of us. Sure. I get to go to my kid's soccer game. Next week, you take the wife on vacation that you wouldn't otherwise be able to do and I wouldn't be able to do. Correct. And I'm willing to work additional hours next week in exchange for the time off this week. And you're willing to work time off this week in exchange for that next week. Why isn't that just a great system? It's a great system, except that you want to tell the employees and you want to tell the company that overtime is different, right? If you're going to go over your overtime definition, you need to give it premium wages. Well, you keep calling it overtime, but why isn't it just flex time? Why isn't it just flex time that says, here's my 40-hour week schedule, and this week, it would be really convenient for me if I could take Friday off. And next week, it would be really convenient for you if you could take Friday off. So I'm willing to work Friday for you next week if you're willing to work Friday for me this week. And I realize I might have to work some more hours. But over the two-week period, we both worked 80 hours. Yeah, that's great. And there's nothing wrong with that as long as you don't hit the premium wage requirement. So what's wrong is that you take away that opportunity for the employees to swap because you're going to tell the company, you let us swap. We're going to make you pay more. And the company doesn't want to pay more hours per hour. And so they say, nope, no more swapping. And exactly how does that help your clients? Well, it helps the client because it forces the company to schedule better. Stop. Stop. I raised this question before. The schedule is driven by the employee's choice based on their seniority. The company doesn't have to do anything after that. What do you mean by schedule better? The schedule is done by U.S. Airways, and then the employees pick it by seniority. And that's it. Once they've done it, the company can say, okay, that's your schedule. We're done with this. Yes. And so what causes the company to want after that to schedule better, as you've told us a couple times? I don't understand that at all. Because if there are shifts that are open, if after they come up with the schedule and the shifts are open, those shifts need to get covered, right? Stop. And, yeah, but that happens under the current system or under the system you're proposing to modify. If the company makes somebody work overtime, they're going to have to pay. That's not what this lawsuit is about. This lawsuit is about employees who look at their shifts and say, I want to do the swap that Judge Bybee just described. And it seems to me this lawsuit is driven to cause the company to say, you can't do that anymore. No, this lawsuit is driven by what the AB60 enacted, okay? And you need to manage that. So which provision do you think specifically prohibits this kind of arrangement? It doesn't prohibit this type of arrangement. All it says is once you hit the threshold of what overtime you've defined is, then you need to pay premium wage rates. And that's 514. That's the matter. You've defined overtime the way you did. Now you have to pay premium wage rates if you reach over that. It's as simple as that. And, Your Honor, the other thing that I wanted to make sure. In the brief, you mentioned the fact that you want this to be certified to the California Supreme Court. Is that still your position, or can we go ahead and make a ruling here? I think you could go ahead and make that ruling, Your Honor, because there's no countervailing reason, really, to certify it to the California Supreme Court. There are no cases that talk specifically about these issues. So your position is just that Section 514 says if you work more than 40 hours in any week, then you're going to get paid overtime. If you work more than what your CBA says is overtime, then you have to pay premium wage rates. And if the CBA says it's not overtime if you agreed voluntarily to take on additional hours in exchange for somebody else? That's fine. If that's what the CBA says, that's not what this CBA says. This CBA says, yes, it is overtime, but we're not going to pay it because you got it through a shift rate. How is that different from what I just said? Because they recognize that it's overtime. Well, it's more than 40 hours, but if you voluntarily assume 40 hours because you've traded with somebody else on a shift, then the CBA says that's not overtime that we will pay for. Right. It's clearly in excess of 40 hours. Nobody's going to dispute that. Right. And that's how your CBA described overtime. And that's the gist of the matter. If you've bargained with what amounts to a daily overtime and you've bargained with what amounts to a weekly overtime. Counsel, I'm really confused. Is this a violation of the CBA, a violation of the statute, or is the way that U.S. Air is enforcing it here a violation of the CBA? No. The CBA is not a violation of the statute if it doesn't pay the premium wage rates. Yes. The CBA does violate Labor Code 514. Okay. You're down to a little under two minutes. Did you wish to reserve time? Yes, Your Honor. All right. Thank you, Mr. Oroarte. Mr. Koswini. Good morning, Your Honors. May it please the Court, Adam Koswini for Eppley. There's a couple of things I'd like to address from that argument, and I'll start off with a minor point so I don't forget, and I think you just raised it, Your Honor, just at the end there. There's a thread in Appellant's argument that shows up for the first time in the reply brief and then comes up again in his response to our notice of supplemental authority, which is he's asking the Court to take a look at two separate provisions of the CBA that talk about overtime, talk about when it's qualified, talk about when you're eligible for overtime under the CBA. That was never raised below. It was never raised in the opening brief. If that's really what's going on here, then the entire issue is preempted by the Railway Labor Act, and there's a whole bunch of citations I could give you for that. The district court didn't discuss that at all. Well, it wasn't argued before the district court. I think it showed up. That explains why it didn't discuss it. I think it showed up for the first time in the reply brief, and Your Honor just picked up on it as well, that there is this thread in the argument that he's saying that for some purposes, shift trades are overtime under the CBA, and for other purposes they're not. I don't think we need to touch that with a ten-foot pole, but if Your Honors are inclined to go there, with all respect to Your Honors, you have no jurisdiction to interpret a CBA. The only entities that can interpret a CBA under the Railway Labor Act are system boards of adjustment, and you can take a look at the Saridakis case, the Ninth Circuit case, 166F3 at 1287 for that principle, should you feel it necessary to go there. I don't think you do, but I just wanted to flag that point because there is this element of the appellant's argument that seems like it's starting to go there. You have a case in support of your position. The plaintiff didn't seem to have any. Maybe there aren't any out there, or is it just a review of the statute? I mean, I think it is, Your Honor, a review of the statute, and let me explain why. Plaintiff wants to focus on Section 514, really to sort of the exclusion of all of the other sections of the Labor Code and everything else that was generated as part of AB60, and I think the history here is really informative. Prior to 1987, there were no Labor Code provisions that talked about overtime. It was entirely a creature of the wage orders as promulgated by the IWC. What happened in Round 87 is the IWC decided to revise those wage orders and say now previously you could qualify for overtime if you worked more than 40 hours in a week or more than eight in a day, and they revised them in 1987 to say to remove the daily piece. You now had to work more than 40 in a week. If you worked more than eight in a day but not more than 40 in a week, you were no longer eligible for overtime. Sacramento was very unhappy with that. Sacramento passed AB60, which is the genesis of all of these Labor Code sections we're talking about, and basically the idea was to revoke that decision that the IWC had made and to reinstate daily overtime. But the legislature was very, very careful when it did it, and it added 515B, and 515B says, look, to the extent that it was an exemption that existed in a wage order prior to 1987, we're not displacing that. We're not touching that. The IWC still has full authority to retain those and to interpret them and to apply them. And what we've all been calling the RLA exemption was exactly such an exemption. It has existed since the 70s. It has continued unmolested through this entire time period right through to the present. And the reason for it, and this is in the supplemental excerpt of record, Volume 9, page 2186, the IWC had made the determination that employees subject to an RLA CBA, not any CBA, but very specifically an RLA CBA, were adequately protected by that CBA and therefore were largely exempted from the provisions of the wage order. Fast forward many, many, many, many years. Now you have Section 514, which was added again by the legislature in 1987 for the reasons I just mentioned. And what 514 actually does is expands the exemptions that are available to employees who are subject to a collective bargaining agreement because the RLA exemption is specific to RLA CBAs. And the reasoning behind it that I just gave you was specific to RLA CBAs. Sacramento then took the additional step of saying, well, actually, in addition, any CBA can avoid these overtime requirements if it meets certain requirements. And so plaintiff, or appellant rather, had started off his entire – So just one question. I'm sorry to interrupt you. No, no. So one question that sort of bothers me is that exemption in 515 seems to sort of take away everything else that the legislature was doing in AB 60. It seems to be a hole big enough to drive a truck through. I don't think so, Your Honor. I think, with due respect, I think all the legislature was recognizing was that to the extent that an employee was covered by a CBA, any CBA, meaning not just an RLA CBA, then they were probably adequately protected so long as there was a particular floor. And the particular floor was 30% more than the then-applicable minimum wage. Lots of employees aren't subject to any collective bargaining agreement. And so there are many, many, many employees in California that 514 just has absolutely no applicability for whatsoever. So I don't think it undoes everything. I think it broadens the existing – What the IWC had done previously was to say, you know, you have this exemption if you're an employee pursuant to an RLA CBA. The legislature, in passing, you know, AB 60, then says, well, it's not just RLA CBAs. It's also other CBAs so long as it meets these baseline criteria. Plaintiff turns around – or appellant turns around and says, well, that means now that that baseline limitation on 30% more than the minimum wage also – and premium wages for all hours worked, all overtime hours worked, also has to apply to the RLA exemption that had preexisted in the wage orders. And that just violates every principle of construction that California courts use when they're looking at the labor code and the wage order. The instruction is always harmonize, if at all possible. If there's an express conflict, then you have to deal with it. But otherwise, harmonize, if at all possible, because they recognize that there are these two sort of equally applicable, if you will, systems of regulation. There is no conflict between the general CBA exemption in 514 and the RLA exemption that's in the wage order 9. All the court needs to do is look at those, put them side by side, and say, okay, if you're employed pursuant to an RLA CBA, then the RLA exemption applies. If you're employed pursuant to some other CBA, then, you know, 514 applies. And, again, 515B, you know, supports that argument because it explicitly says that the legislature wanted to preserve all of the exemptions that had existed in the wage order prior to AB 60. And nobody is disputing that that is exactly the case with the RLA exemption. The potential complication there, though, is the first few words of subsection B, because that's where it has the except as provided in this section, and then I forget what the other one is. And so it's not as simple as being able to say if it was in place before 97, it's untouched. We still have that language we have to navigate. So why isn't that language a problem? I think it's for the reason I mentioned a minute ago. What I read that to mean is it requires a conflict. If there's a conflict, if there's something in the rest of AB 60 that conflicts with something that had preexisted, then it falls under that introductory language that Your Honor is referring to. But there is no conflict. And, again, courts really endeavor to try and read harmony into this dual system of regulation between the labor code and the wage order. And I don't see a conflict. I see a provision that is specific to the RLA, and when you go back and you look at the statement of findings in the record that I referred to before, they had a specific reason for singling out RLA CBAs. And then the legislature came along many decades later and broadened that protection and said, you know what, that's a good idea. Other people that are employed pursuant to CBA should have a similar protection, but we're going to add this additional couple of baseline requirements. I just don't see a conflict there at all, especially when what you do have is the explicit language of 515B saying that what the legislature was trying to do was preserve all of the exemptions that had preexisted. And the RLA exemption is certainly one of those. And then, you know, Collins and other courts that are cited in my briefing, they really look at that language and they say, well, what's really going on here is that, you know, it's making clear that to the extent that the IWC changes things or enforces exemptions consistent with 515B, they're doing it so that it doesn't violate a statute, you know, a statutory provision that was enacted as part of AB60, again requiring conflict. I don't see any conflict here at all. Something else I wanted to mention on a different topic. There's this argument that, well, what would happen if, I think we all agree, I think Appellant conceded that if the court was to rule the way he's asking you to rule, it would essentially mean there would be no more shift trading. I think we can all sort of agree with that as a practical matter. Appellant then says, well, what that would result in is part-timers being converted to full-timers or additional hiring. No. And this has gone through in the statement of facts in my brief with cites to the record if you want to follow up on it. But what happens is there's a scheduling provision in the CBA. It's very long. It's very complicated. I won't pretend to you that I understand all of it. But what happens is that essentially every bid period there's a schedule put together. It's posted. And people work pursuant to that schedule. They bid on it. They bid, yes, Your Honor. They bid for it. And then however that comes out based on the seniority provisions and the scheduling provisions of the CBA, that's the schedule people worked. If there was no shift trading, that's where it would stop. No additional hiring. No part-timers to full-timers. No it's going to force Airways, now American, to schedule better. No. It just means at that point that people will work the schedule that the bid system generated. It's only if you go the additional step of allowing them to swap voluntarily, which, as all of Your Honors mentioned, is a benefit that the union has negotiated. It's common in the industry. You know, in the record there are many declarations that we submitted to Judge Breyer sort of talking about employees valuing this and how they use it and what a benefit is and everything. But if it went away, the only impact would be that the schedule as bid would be worked. That's it. So this benefit of hiring more people or scheduling better or converting part-timers to full-timer, it's totally unsupported by the record, and I would submit to you that it's also illogical. And then lastly, my last couple of minutes here, just on the issue of certification to the California Supreme Court, that's a pretty high standard. I mean, if you look at the standard, it really is designed for unique circumstances where there's no guidance. I'll ask you about a variant of that, which is if there is a case that's been certified and the Supreme Court has taken, I guess it's the Ward case. Three of them, Ward, Vidrio, and Oman. Should we wait for those? They have no – so I'm actually the lawyer in those cases as well. They have no impact on this case whatsoever. Well, first, if you're the lawyer, what's the timeline? It's been, what, a year and a half or something? It has been a year and a half, Your Honor. Has it been briefed? So we briefed it sort of soon after it was certified, and it's been – It's sitting there. It's sitting there. I was going to try not to use that phrase, but since you did, I'll ask away. I like them. I know lots of the justices, but they're kind of backlogged. Yeah, yeah. I have the sense that maybe it's not their biggest priority over there. But to be honest with you, Your Honor, what I'm telling my clients when they ask that same question, which is monthly, I tell them it's probably going to be in the first quarter of next year because it has been there for a while, but we're just waiting for an argument date. But you don't think we ought to wait? I do not think you want to wait. So the thing that is at issue primarily in the Ward and Vidrio cases is whether the RLA exemption applies to wage statements, to 226, not to any provisions having to do with overtime or hours worked or premium rates of pay or anything like that. And, you know, there's a lot of intricacies to that argument that I won't get into, but it's very different from here where it's very clear that the overtime provisions of 510 are exactly the type of provision that 515B was designed to preserve. The exemption to that was designed to preserve. I think you've got the statutory language is very clear. I think you've got the history that I've cited to you in my briefing and today before you. You've got the Collins case. You've got the Branish case. I think there's plenty of guidance to the extent that you need to do anything other than just look at the text of the statute and the history thereof. If anything else, I'll submit. Thank you, Mr. Coswini. Thank you, Your Honors. Mr. Uriarte, you have time remaining. Thank you, Your Honor. Your Honor, with regard to the Ward case, I think the Ward case is actually more related than what's been stated, and our brief actually gets into it. It's also the RLA exemption. It's also the IWC component with the labor codes. So do you think that we need to wait for the California Supreme Court? For consistency purposes, I would think so, Your Honor, or certify to them so that they do just one whole big sweep with regards to these issues, right? I think that's also a good thing because the issues are so related with regards to the RLA, the IWC, the labor code. I think for consistency purposes, maybe the California Supreme Court should deal with the issues. With regards to Collins and harmonizing, I think Collins is actually a good case for this Court to review. Collins actually mentions the exemptions, the collective bargaining agreement exemption, and I think Collins tells you that there is an effect to the introductory clause and that the IWC does not have the power to actually undermine the labor code. And that's the thing. We can harmonize the situation here. But to harmonize the situation here, you'd have to read the premium wage rates requirements into the CBA in question. And then the point with regards to is it better for the workers or not, well, the legislature is the one that's spoken with regards to what's better for the workers, right? And remember the— With respect, that doesn't answer the question at all because if we go through the scenario as it was just outlined, the legislature, if we interpret the statute the way you ask us to, has spoken. And the company responds by taking away this benefit that's been negotiated for. So I don't understand how your answer actually speaks to the problem. How does that benefit the employees? Because there are negotiations going forward, right? So there's an adjustment that happens, right? Well, if there are negotiations and you leave it to that, it doesn't need your lawsuit. If the workers decide we're not going to go for this trading anymore unless you pay us higher rates for the overtime hours, that can be dealt with in negotiations. Right, but the negotiations cannot undermine state statutory rights, right? CBAs cannot enter into agreements that undermine state— And as a result, you do not answer the question as to why it is that simply doesn't lead the company to take away this benefit. Because we're assuming that that's what's going to happen. Other results can happen, Your Honor. Other results can happen where they actually adjusted the needs of the workers. Remember, they need these workers. These are fleet service agents that work our airports. They need these workers. And the thing is what we're asking for is to strengthen their overtime rights. Thank you, Counsel. Thank you.  Angeles v. U.S. Airways is submitted.
judges: Siler, Clifton, Bybee